WILLIAM W. MANLOVE, OSB #891607
Senior Deputy City Attorney
william.manlove@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **HANNAH AHERN,** | Case No.: 3:21-cv-00561-YY |
| **PLAINTIFF,** | |
| v. | **DECLARATION OF LARRY K. GRAHAM** |
| **ERIK KAMMERER and CITY OF PORTLAND,** | (In Support of Defendant City of Portland's Motion for Partial Summary Judgment) |
| **DEFENDANTS.** | |

I, Larry K. Graham, declare as follows:

    1. I was hired by the City of Portland's Bureau of Police as a police officer in 1996.

    2. I became a member of the Portland Police Bureau's ("PPB") Rapid Response Team ("RRT") in 2001. RRT is PPB's detached, specialty unit assigned to provide crowd control and management services. While assigned with RRT I worked as a line officer, a grenadier, a squad leader, a RRT lieutenant in charge of several RRT squads, and as a crowd management incident commander ("CMIC"). I remained on the RRT until approximately 2017. Although the annual training varied somewhat over the years depending on the PPB budge, as a member of RRT I

Page 1 – DECLARATION OF LARRY K. GRAHAM

received at least 30 to 40 hours of annual In-Service training.  I began acting as a CMIC for large events that required the creation of an emergency operation center in around 2015.

3. I was the PPB CMIC for the crowd management and control events that occurred in Portland on October 12, 2016, on November 10 through November 13, 2016, on January 20, 2017, on February 16, 2017, on February 20, 2017, and June 4, 2017.  Prior to June 4, 2017, I had worked as the CMIC for approximately five other events.   By PPB Directive 635.10, the CMIC is the police official with authorization and overall responsibility for managing large scale demonstrations by establishing objectives, planning strategies, and implementing tactics in accordance with Directive 635.10 and PPB Directive 700, National Incident Management System ("NIMS") and Incident Command System ("ICS").

4. I have recently reviewed parts of the PPB Incident Action Plans ("IAP") associated with the events identified in paragraph 3 above.   The IAPs I reviewed were stamped Ahern-City_007844-007859, Ahern-City_010615-010677, Ahern-City_008073-8111, Ahern-City_010582-0597, Ahern-City_ 008224-8241, and Ahern-City_008522-8545.  The IAP is a standard planning document used by police agencies throughout the country to plan for large scale events that could impact public safety.  The IAP is part of the NIMS and ICS.  These events could include not just protests and demonstrations, but also natural disasters, such as hurricanes or earthquakes.

5. The October 12, 2016, event involved a protest that occurred at Portland City Hall related to City Council deliberations for a labor contract with the Portland Police Association ("PPA") labor union.  My objectives as CMIC for this event were, in part: to ensure the safety of all citizens, first responders, and protestors; facilitate all citizens' First Amendment rights to assembly and speech; respond to calls from City Hall security or the Mayor requesting assistance in securing entry points or persons trespassing at City Hall; and issue warnings to, and if necessary, make arrests of persons trespassed from City Hall if those persons refused to leave.  I instructed officers through the IAP that force was to be consistent with PPB Directives 1010 and

Page  2  –  DECLARATION OF LARRY K. GRAHAM

635.10, and that only force reasonably necessary under the totality of the circumstances to accomplish the police action would be used, starting with mere presence and verbalization.

6. During the October 12, 2016 event, Mayor Hales had to recess the City Council and then reconvene in a conference room in City Hall following repeated disruptions to the meeting. At some point, City Hall was closed to the public because protestors were disruptive to the business in the building. I directed the officers at City Hall to make announcements that City Hall was closed and that people needed to leave the building or they could be arrested for trespass, and such announcements were made. Many people inside City Hall left as instructed. Others, however, did not. They began to blook the doorway on the 5th Avenue side of the building and began to physically push back against PPB officers who were trying to remove people from the building. PPB officers had to physically remove some of the persons from inside City Hall who refused to obey the police orders to leave the building.

7. November 10, 2016, through November 13, 2016 involved multi-day, wide-spread protests in downtown Portland in response to the election of former President Trump. These multi-day protests involved different operational periods for PPB, and I was one of PPB's CMICs for this multi-day protest. I recall first responding as CMIC when I receive a call in the middle of the night that a group of protestors had blocked one of the freeways near downtown.

8. My objectives as CMIC were, in part: to protect life and safety; minimize damage to property and vehicular disruption; minimize police and protestor confrontations; and to facilitate the right to exercise free speech. No person or entity obtained any permit to march, occupy, or parade in the City's streets. PPB's response to the protests changed over the course of the protests. Initially, a priority was to minimize police and protestor confrontations, especially given the large number of people protesting, and the comparatively smaller number of police resources. Therefore, protestors were allowed to march unpermitted in the streets and on the bridges. Later in the multi-day protest, after PPB was able to mobilize more law enforcement resources, and due to the level of property damage and disorder that had occurred, the CMIC

Page 3 – DECLARATION OF LARRY K. GRAHAM

adjusted the police response to marching on and blocking of streets, bridges and MAX tracks. During all periods to the protest, however, officers were directed through the IAP to facilitate all citizens' lawful exercise of their First Amendment rights to assembly and free speech.

9. For the November 10, 2016, through November 13, 2016 event, any use of force was to be consistent with PPB Directives 1010 and 635.10, and that only force reasonably necessary under the totality of the circumstances to accomplish the police action would be used. The IAP instructed officers that the use of pepper spray should be targeted against specific individuals who were reasonably perceived to be causing physical harm or threatening physical harm to any person, engaging in looting or the destruction of property, or displaying intent to physically resist a lawful police order. The IAP instructed officers that broadcast pepper spraying a group of protestors should be avoided unless there was a crowd surge that threatened to overrun a police line. With respect to less lethal munitions, the IAP instructed officers to use bean bag rounds primarily to target individuals throwing projectiles, and explained that using less lethal munitions as a dispersal technique would only be done at the CMIC's direction, or unless there was an exigency to prevent injury to a person or destruction of property. With respect to tear gas or other riot control agents, the IAP instructed the officers that riot control agents would only be used at the CMIC direction where the crowd was resistant to a dispersal order in conjunction with persons in the crowd engaging in violent behavior such as throwing items at the police, attacking uninvolved citizens or vehicles, or engaging in widespread property damage.

10. During the November 10, 2016, through November 13, 2016, events, protestors in fact took over streets, blocked intersections, and took over bridges and highways. However, protestors also threw objects at the police and engaged in property damage, including smashing windows of businesses, and smashing the windows of cars at a car dealership. At one point, during the course of these protests, a protestor was shot by an individual trying to drive a vehicle on the Morrison Bridge where a protest was taking place. At times during these protests, in response to specific protestor actions, PPB officers deployed impact and riot control agents.

Page 4 – DECLARATION OF LARRY K. GRAHAM

Additionally, at one point, PPB officers arrested a large group of protestors who refused dispersal orders after repeated announcements from PPB informing them that the assembly was unlawful, directing them to disperse, and warning of arrest.

11. The January 20, 2017, event involved a protest in downtown Portland in response to the inauguration of former President Trump. My objectives as CMIC for this event were, in part: reach out to organizers to encourage cooperation, sharing of information and planning designated routes for marches; keep major transportation corridors open for the public and emergency vehicles; promote and encourage a safe environment for people to lawfully assemble, mitigate property damage and harm to private and public property, and arrest criminal offenders.

12. For the January 20, 2017, event, I instructed officers through the IAP that force was to be consistent with PPB Directives 1010 and 635.10, and that only force reasonably necessary under the totality of the circumstances to accomplish the police action would be used. My instructions to officers through the IAP was the same as those described in the IAP for the November 10-13, 2016, event, which I describe in paragraph 9 above. In addition, I instructed officers through the IAP for the January 20, 2017, event that all arrests shall be based on probable cause, which was always my expectation as CMIC for any event.

13. For the January 20, 2017, event, protestors crowded into streets, blocking intersections and traffic. Protesters threw objects at the police and damaged property. There were reports of protestors with weapons, including knives, guns and hammers. PPB issued multiple warnings to disperse, which many in the crowd ignored. In the course of responding to the unlawful gatherings and specific protestors' actions of throwing objects, destroying property, and physically resisting police orders to disperse, PPB deployed less lethal munitions, pepper spray and tear gas.

14. The February 16, 2017, event involved a protest in downtown Portland in response to a PPB shooting and killing of an African-American teenager. My objectives as

CMIC for this event were, in part, similar to the earlier protests, described in paragraphs 9 and 12 above.

15. For the February 16, 2017, event, I instructed officers through the IAP that all force was to be consistent with Directive 1010 and 635.10, and that only force reasonably necessary under the totality of the circumstances to accomplish the police action would be used. I instructed officers through the IAP that pepper spray, less lethal munitions, or tear gas were to be used in same manner as those described in the IAP for the November 11-13, 2016 event, which I describe in paragraph 9 above. In addition, I again instructed officers through the IAP for the February 16, 2017, event that all arrests shall be based on probable cause.     .

16. I do not recall any of the details of the February 16, 2017, protest.

17. The February 20, 2017, event involved a number of groups for a "Not My President's Day" rally in downtown Portland. protest in downtown Portland against the presidency of former President Trump. My objectives as CMIC for this event were, in part: reach out to organizers to encourage cooperation, sharing of information and planning designated routes for marches; promote and encourage a safe environment for people to lawfully assemble; provide safe spaces for the expression of opinions and acts, unless the crowd size and demeanor creates a substantial and imminent threat to individuals, groups or property that cannot be safely managed or controlled if allowed to continue;  keep major transportation corridors open for the public and emergency vehicles;, mitigate property damage and harm to private and public property, and arrest criminal offenders.

18. For the February 20, 2017, event, I instructed officers through the IAP that force was to be consistent with PPB Directives 1010 and 635.10, and that only force reasonably necessary under the totality of the circumstances to accomplish the police action would be used. My instructions to officers through the IAP was the same as those described in the IAP for the November 10-13, 2016, event, which I describe in paragraph 9 above. In addition, I instructed

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

officers through the IAP for the February 20, 2017, event that all arrests shall be based on probable cause.

20. 19. For the February 20, 2017, event, a group of protestors congregated in the street in front of the Federal Building on Third Avenue, without a permit, blocking traffic. After multiple warnings to these protestors to get out of the street, PPB officers engaged in efforts to clear the unpermitted protestors from the street, and that some protestors physically resisted that effort. PPB arrested several persons for failing to obey the police orders to get out of the street.

20. The June 4, 2017, involved a permitted demonstration by members of a group called Patriot Prayer in Terry Shrunk Plaza in downtown Portland. Terry Shrunk Plaza was federal property. The Patriot Prayer demonstration led to various groups of counter-protestors convened across the street in a City park, Chapman Square, as well as in front of City Hall on SW 4th Avenue and in front of the Edith-Green federal building on SW 3rd Avenue. A double homicide had occurred on the MAX train on May 26, 2017, involving a person believed to have an affiliation with white supremacists, which seemed to raise tensions among the different groups involved in the June 4, 2017, event. The three different counter-protestors to Patriot Prayer had different approaches to their protest tactics with the group gathered in Chapman to be more prepared and desirous for a physical confrontation with Patriot Prayer than the other two groups. No person or entity obtained any permit to march, occupy, or parade in the City's streets.

21. My objectives as CMIC for this event were, in part: reach out to organizers to encourage cooperation, sharing of information and planning designated routes for marches; promote and encourage a safe environment for people to lawfully assemble; provide safe spaces for the expression of opinions and acts, unless the crowd size and demeanor creates a substantial and imminent threat to individuals, groups or property that cannot be safely managed or controlled if allowed to continue; keep major transportation corridors open for the public and emergency vehicles;, mitigate property damage and harm to private and public property, arrest

Page 7 – DECLARATION OF LARRY K. GRAHAM

criminal offenders, and keep Patriot Prayer protestors and the counter-protestors separate, to minimize the risk of confrontation and violence between the two groups, which occurred in subsequent protests in downtown Portland.

22. For the June 4, 2017, event, I instructed officers through the IAP that force was to be consistent with PPB Directives 1010 and 635.10, and that only force reasonably necessary under the totality of the circumstances to accomplish the police action would be used. My instructions to officers through the IAP was the same as those described in the IAP for the November 10-13, 2016, event, which I describe in paragraph 9 above. In addition, I instructed officers through the IAP for the June 4, 2017, event that all arrests shall be based on probable cause.

23. During the June 4, 2017, event persons in Chapman Square were throwing objects across SW Madison Street towards the Patriot Prayer demonstrators in Shrunk Plaza. Because of this physical violence, I ordered RRT, to move the protestors in Chapman Square back halfway into the park to create a buffer zone between the opposing groups. I made this decision solely on the basis of the safety of all protest participants, not on the basis of favoritism of one group over another.

24. Eventually, due to the physical resistance of the protestors in Chapman to move back, I closed both Chapman and Lownsdale Squares, and ordered the crowd to disperse. RRT gave multiple dispersal orders lasting approximately 45 minutes. Although some protestors heeded the orders and dispersed, many did not. Instead, hundreds of protestors acting as a cohesive unit went on an unpermitted march through downtown Portland. After consulting with a City attorney and district attorney, I ordered the RRT squads to detain this group of people for purposes of investigating the crime of Disorderly Conduct in the Second Degree. I understand that my decision to order this detention of this group of people marching without a permit was upheld by a federal judge in a subsequent court case.

25. I intended that all of my actions and decision-making as CMIC for the events on October 12, 2016, on November 10 through November 13, 2016, on January 20, 2017, on February 16, 2017, on February 20, 2017, and on June 4, 2017, or at any other time I served as CMIC for PPB, were to be in conformance with the operational priorities, incident objectives, and standard rules of engagement as described in the IAPs, and as I described above in paragraphs 5, 8, 9, 10, 11, 12, 14, 15, 17, 18, 21 and 22. None of my actions as CMIC were ever based on the content of speech, message or perceived ideology of any person or group of protestors, but instead on the conduct or behavior of the person or group of protestors, and whether that conduct or behavior was criminal or a threat to public safety.

26. I make this declaration in support of Defendant City of Portland's Motion for Partial Summary Judgment.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: 12/21/2023

_____
Larry K. Graham

Page 9 – DECLARATION OF LARRY K. GRAHAM