**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
**Jonathan Gersten**, OSB #191582
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**ATTORNEYS FOR PLAINTIFF**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| HANNAH AHERN,<br><br>Plaintiff,<br><br>v.<br><br>ERIK KAMMERER, CITY OF PORTLAND; and JOHN DOES 1-5.<br><br>Defendants. | Case No. 3:21-cv-00561-YY<br><br><br>PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>*Oral Argument Requested* |

**PLAINTIFF'S BRIEF IN OPPOSITION TO PARTIAL SUMMARY JUDGMENT**

Defendant City of Portland has moved for Partial Summary Judgment, but facts material to the claims moved against by Defendant are disputed and summary judgment is unavailable. On the date in question of this case, the City of Portland arrested individuals a jury could conclude committed no act that gives rise to probable cause for arrest. A jury could conclude that these people were arrested for standing on the side of anti-fascist Portlanders. Plaintiff Hannah Ahern ("Plaintiff" or "Ms. Ahern") was one such person. Defendant City supports their Motion with declarations laying out their plans for policing the protests on August 17, 2019. What these plans omit was laid bare on an open audio channel for all to hear: that even absent probable

cause, the Portland Police wanted to arrest leftist protesters for nothing more than being in the street demonstrating their First Amendment protected rights. The City cannot escape liability on these facts.

Defendant City moves on Claims 2 and 5, Plaintiff's *Monell* theory claims that the City had a pattern and practice of violating the First and Fourth Amendments. Based on the facts from this case, the City had an open and verbalized policy of arresting leftist protesters without probable cause. The City was so unabashed about this policy that they announced it over the radio before realizing they were recording and then quickly stopped recording. Ms. Ahern was the victim of this practice. Defendant Kammerer, knowing he had no probable cause to do so, fabricated evidence in a report to justify arresting Ms. Ahern. He initiated the arrest of Ms. Ahern because she spat towards an incoming police vehicle, an act of disgust that is clear to any viewer.

Defendant City condones and ratifies this behavior. As he testified in his deposition, Defendant Kammerer has been investigated by the City on numerous occasions, resulting in either no discipline or "debriefings" that were so inconsequential and substance-free that Defendant Kammerer could not recall any content of the discussions or the persons with whom he had the discussions.

Because the City maintains this practice, the Court cannot grant their Motion.

## FACTUAL ALLEGATIONS

**A. The Day of the Demonstration**

On August 17, 2019, the Proud Boys, a right-wing extremist group with ties to white supremacist and neo-fascist groups, staged a rally in downtown Portland. First Am. Comp. ¶ 7, Dkt. 37. The same day, a large group of Portland residents showed up to counter the Proud Boys

protest—many of whom came to the "Be the Spectacle" counterprotest. *Id.* Plaintiff was leaving work and decided to see the protest. *Id.* at ¶ 8.

PPB officers were warned that after the June 29, 2019, protest there would be an event on August 17 organized by ▮▮▮▮▮▮▮▮▮▮▮▮▮ that would also be attended by ▮▮▮▮▮▮ and people with ▮▮▮▮▮▮▮▮▮▮▮ towards Portland city leadership and the Portland Police Bureau. Ex. 5—Incident Action Plan (Filed under seal).

**B. The Arrest**

At or around 2:00 pm, Ms. Ahern walked towards where she heard commotion and happened upon the scene at SW Oak and SW 3rd Ave. Dkt. 37 at ¶ 34. She witnessed a femme-presenting person get arrested for "twerking," a type of dance. *Id.* Several officers pinned this person to the ground and directed the on-lookers to not interfere with the arrest. Ms. Ahern tried to document what was happening, but was directed by the police to cross the street. *Id.* at ¶¶ 34, 35, 38.

Defendant Kammerer was present and witnessed Ms. Ahern being directed across the street. *Id.* at ¶ 38. Ms. Ahern followed the directions of the two officers and began to cross SW 3rd Ave. *Id.* at ¶ 39. When the PPB officers directed her to cross the street, traffic had been moving southward on SW 3rd Ave. *Id.* at ¶ 39. To avoid being in the way of traffic, Ms. Ahern stopped walking and flagged several cars to pass her by. *Id.* When she entered the street, she saw a police truck enter the middle of the intersection. *Id.* The officers were clad in riot gear: dark black helmets and pads, carrying weapons. Based on what she had witnessed—the police arresting a peaceful protester nowhere near the fascist provocateurs who had hijacked the City—Ms. Ahern was displeased at the sight of the officers now arriving in gear only suitable for a battlefield. *Id.*

While in the middle of the crosswalk, Ms. Ahern spat in the direction of, but nowhere near, the officers arriving on the riot truck. *Id.* at ¶ 40; Ex. 001 at 0:03—Twitter Video. Defendant Kammerer saw Ms. Ahern cross the street, saw that she did not cause a truck to stop suddenly, and saw her spit in the direction of the approaching riot van. *Id.* at ¶ 41. In his police report, Kammerer states that Plaintiff crossed the street directly in front of a vehicle that had to "brake hard so as not to strike Hannah Ahern." *Id.* at ¶ 44. He also characterizes Plaintiff as "clearly involved in the demonstration." *Id.*; Ex. 6—Ahern Arrest Report. Defendant Kammerer claimed Ms. Ahern had committed the crime of Disorderly Conduct II. *Id.*

In deposition, Defendant Kammerer reviewed footage of the incident and insisted that his version of the events was accurate—including that Ms. Ahern had jumped in front of a moving truck causing it to come to an abrupt stop. Kammerer Dep. 134:22-136:9. It is clear from the video that the truck was nowhere near Ms. Ahern, and that she was being very careful and considerate about the passing traffic. She was trying to follow the directions given to her by two other officers to cross the street. Ex. 004—Airplane Video #3, at 1:30.

When pressed on how close the truck was to Ms. Ahern, Defendant Kammerer dithered. Kammerer Dep. 133:3-12; 134:21-136:9. Pressed on the fact that Ms. Ahern was not in front of the truck thus causing it to abruptly brake, Defendant Kammerer insisted that Ms. Ahern was still at fault. *Id.* at 143:20-144:7. When confronted by the fact that a riot van driven by PPB had actually caused the truck to stop, Defendant Kammerer claimed that he did not see the very obvious police vehicle in the intersection. Id. at 134:17-20. Additionally, Defendant Kammerer himself walks into the intersection to contact Sgt. Cieota. Ex. 001.

Pressed on specific details regarding why Defendant Kammerer believed that Ms. Ahern was "clearly involved in the demonstration," Defendant Kammerer cited, "She was in the street facing the police, [and] had an angry look on her face..." Kammerer Dep. 132:17-133:1.

Defendant Kammerer denies that he had Ms. Ahern arrested because she spat towards the police. Kammerer Dep. 191:10-13. The video of the event contradicts this. Ex. 004. Defendant Kammerer clearly only becomes animated after Ms. Ahern spat. *Id.* Ex. 001 at 0:04. Until then, Defendant Kammerer remained visibly unconcerned as a truck—per his report, testimony to the Independent Police Review, Ex. 7 at Ln. 401-403: Excerpt from IPR interview (Filed under seal), and in deposition—allegedly almost hit Ms. Ahern. Despite expressing concern for her safety in his IPR interview, he was unconcerned on August 17. He also made no effort to cite the truck driver for allegedly almost running into Ms. Ahern. Kammerer Dep. 133:3-13.

**C. Disorderly Conduct II Arrests on the Same Day.**

On August 17, 2019, the City maintained a practice of using low-level Disorderly Conduct II and Interference with a Police Officer arrests to clear protesters exercising their civil rights.

At 13:17:58 on August 17, time stamp 14:14 in the police plane video cited below, an officer radio transmission states "are you greenlighting arrests based on individual PC for discon?" followed by another officer who says "absolutely." Ex. 002—Airplane Video #1. The verbal tone of this exchange could be interpreted as mocking. At 20:14 timestamp in the same video (13:23:54 on Aug 17), an officer says, "I know it might be a stretch, but if we can arrest a couple people for discon… if we can" followed by another officer saying "are we recording?" *Id.* The recording then abruptly shuts off at that point and does not turn back on for another 7 minutes. Ex. 1 – 2 (Exhibits 2 and 3 and sequential, and the timestamps indicate a time gap of

about 7 minutes). There is no further mention nor admonishment on the recordings indicating that a supervisor had corrected the previous statement.

On August 17, 2019, four people were arrested for either or both Disorderly Conduct II and/or Interference with a Police Officer: Teagan Winkler, Hezekiah Bulnes, Alonna Mitsch, and Plaintiff Hannah Ahern.

**Winkler**. Teagan Winkler exercised her constitutionally-protected speech rights and attempted to counter the hate speech with the roar of her motorcycle engine. Officer Pavon, a Portland Police Bureau member with a checkered past, allegedly "told Winkler again to stop and gave her opportunity to stop her behavior; however, Winkler was careless and demonstrated she did not care and failed to stop. Winkler gave me no other option than to arrest her." Ex. 8—Winkler Arrest Report. Officer Pavon became a Portland Police Officer after being fired by another police department in California, and was later investigated by the Police Bureau for allegedly attempting to frame another man with slashing his tires.[1] Making mechanical noise with a motor vehicle to drown out fascist speech is itself protected political speech. *See, e.g.*, *City of Eugene v. Powlowski*, 116 Or App 186, 190 (1992) ("expression is no less protected because it is manifested by a mechanical sound"); *accord State v. Hagel*, 210 Or App 360 (2006).

**Bulnes**. Plaintiff did not locate any discovery about this arrest. From Court records, it appears that Mr. Bulnes was arrested by the notorious protest officer, Craig Lehman. Ex. 9—Lehman Employment File (Filed under seal).

---

[1] Maxine Bernstein, *Tire-slashing of Portland police patrol car leads to investigation of officer*, The Oregonian (Dec. 4, 2013), available at https://www.oregonlive.com/portland/2013/12/tire-slashing_of_portland_poli.html.

**Mitsch**. Ms. Mitsch attended the demonstration wearing a hat with clear lettering stating "BLACK LIVES MATTER" and also wore a shirt with the message Black Lives Matter. *Mitsch v. City of Portland, et. al.*, USDC of Or. Case No. 3:21-cv-01222-SB, Dkt. 1 at ¶ 11. Around 2:55pm, counter-demonstrators marched in the streets and sidewalks around the SW 3rd Avenue and SW Oak area in downtown Portland. *Id.* at ¶ 12. Ms. Mitsch crossed the street and heard music blaring NWA's popular song, "Fuck Tha Police." *Id.* Hearing the song while crossing the street, Ms. Mitsch decided to twerk in front of a slow-moving Portland Police truck carrying riot police, including Defendant Kammerer as depicted in Figure 1 in her Complaint. *Id.* Despite others being in the street as well, Ms. Mitsch was targeted for arrest. *Id.* at ¶¶ 14, 15. The officers violently took her to ground. *Id.* Her arms were twisted, and her wrists bound in too tight tie-wraps. *Id.* Ms. Mitsch was charged with Interference with a Police Officer and Disorderly Conduct II. *Id.* at ¶ 17. She denied these charges and took her case to a Multnomah County jury. *Id.* She was acquitted on February 27, 2020. *Id.* at ¶ 18.

**Ahern.** As discussed above, Ms. Ahern was arrested by Defendant Kammerer on fabricated evidence that she had blocked traffic, evidence that would not allow a reasonable officer to believe they had probable cause to arrest her.

### D. A History of Complaints and No Discipline

Defendant Erik Kammerer defines a City system of unaccountability and ratification of unconstitutional behavior.

Defendant Kammerer has been subject to a disciplinary investigation at least 10 times in the last seven years. On five of those occasions, Defendant Kammerer had been "Exonerated" or had findings "Not Sustained" but with debriefing.

> Q. Okay. I see noted in later findings and dispositions the additional qualifier of "with debriefing." Do you know what that means "with debriefing"?
> A. I do.
> Q. What does that mean?
> A. So even though I wasn't found to be in violation of policy, we talk about it and what could have done better -- what could have been done better or different.

Kammerer Dep. 40:10-19.

For every occasion that Defendant Kammerer was "debriefed" in the last seven years, he has no recollection of what was discussed or even who conducted the debriefing. *Id.* at 41:19-42:6; 44:18-45:2; 48:21-49:2; and 80:10-19; Ex. 11—Interrogatory Response, at Interrogatory No. 2. ███████████████████████████████████████

████ Assistant Chief Jeffrey Bell attempts to correct Defendant Kammerer's memory gap in his declaration through a hearsay recollection of a letter allegedly summarizing the coaching that Defendant Kammerer received. Dkt. 66, ¶ 15. ████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Another case involved Defendant Kammerer forcing a driver off the road for allegedly speeding. As Defendant Kammerer explained:

> A. I was driving southbound on McLoughlin [more commonly known as Martin Luther King Blvd]. Mr. McCarthy was speeding, and rather than perform a traffic stop, I simply pulled forward in front of him and activated my rear deck lights on my unmarked police car, and I don't know why, but he then lost control of his car and crashed.
> Q. What did he crash into?
> A. The side barrier.
> Q. Were you behind his vehicle at first?

>A. I was beside him.

Defendant Kammerer pulled this maneuver despite having no training do so.

>Q. Was pulling in front of Mr. McCarthy an authorized tactic per your training?
>MR. CALDWELL: Object to form. Object to form. Sorry.
>MR. MANLOVE: Join.
>THE WITNESS: I don't recall being trained to do that.

Defendant Kammerer was sued by Mr. McCarthy, which described that Defendant Kammerer "entered Plaintiff's lane and space, thereby forcing Plaintiff's vehicle into a concrete barrier, spinning Plaintiff's vehicle 180 degrees…"[2] ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 10 at 4—McCarthy Investigation (Filed Under Seal). Defendant Kammerer settled this case, ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* He only faced a debriefing that he cannot recall.

Turning to Ms. Ahern's case specifically, IPR held a perfunctory inquiry into the matter. They allowed Defendant Kammerer to misstate facts about the case, and no video was reviewed with Mr. Kammerer despite its apparent availability. IPR provides no check on the Police Bureau's pattern and practice of unlawful and unconstitutional police actions.

**E. The Pattern Persisted to the Present**

As subsequent litigation shows, the various apparatuses of nominal control over the Portland Police Bureau exposed their inadequacies during the 2020 racial justice protests.

---

[2] At the time of this filing, both PACER.gov and the OECI, the online resource to access e-court documents, are undergoing maintenance. Plaintiff will supplement the record after those systems are back online.

PLAINTIFF'S BRIEF IN OPPOSITION TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Page 9 of 18

As the Court wrote in the *Don't Shoot Portland, et. al. v. City of Portland* case, "Plaintiffs have documented significant abuses by the Portland Police Bureau, described a disciplinary and oversight system unable to handle the pressure of the 2020 protests, and uncovered extreme bias and misinformation in PPB's training. These facts and the events described by protestors are deeply troubling." *Don't Shoot Portland, et. al. v. City of Portland*, USDC Case No. 3:20-cv-00917-HZ, Dkt. 300, 2022 WL 2700307, *9 (D. Or. 2022). The Court reviewed and considered "a sample of 41 FDCRs, we found 45 uses of force where the reported justification on its face is incomplete or does not meet the Graham standard." *Don't Shoot Portland*, at Dkt. 255, ¶ 8, Declaration of Ashlee Albies. The Court also reviewed IPR's force allegation investigations. "Thirty-three cases involving the use of force during protests were administratively closed… largely because IPR could not identify the officer in question... Ten of these cases were dismissed for no misconduct (*i.e.* there was no violation even if the allegations were true), nine lacked merit, six lacked an available complainant, five did not involve PPB officers, one was an unidentified employee, one involved 'other judicial remedy,' and one had a third-party complaint." *Id.* at Dkt. 300, 2022 WL 2700307, *5.

Defendant Kammerer has or is currently facing lawsuits stemming from his actions during the 2020 protests. *Opbroek v. City of Portland, et. al.*, USDC of Or. Case No. 3:22-cv-00610-JR; *Vontillius v. City of Portland, et. al.*, USDC of Or. Case No. 3:22-cv-00765 YY; and *Warren v. City of Portland, et. al.*, MCCC 21CV21137. In *Opbroek*, Defendant Kammerer is alleged to have thrown a flash bang grenade at a peaceful protester. In *Vontillius*, Defendant Kammerer knocked down a line of passively resistant protesters, injuring the Plaintiff, then walked away. In *Warren*, Defendant Kammerer allegedly hit a homeowner in the back of the

head after the homeowner voiced anger at PPB for using tear gas in his neighborhood. Defendant Kammerer has not been disciplined for any of these actions, even in *Vontillius*, which he settled.[3]

## ARGUMENT

### A. Summary Judgment Standards

To qualify for a grant of summary judgment, a moving party must establish the absence of any "genuine issue as to any material fact." FRCP 56(c). "A material fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hanon v. Dataproducts Corp.*, 976 F2d 497, 500 (9th Cir 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 248, 106 S Ct 2505, 91 L Ed2d 202 (1986)). The inquiry is "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 US at 250.

At the summary judgment stage, when overcoming a defendant's motion for summary judgment a plaintiff's burden "is not high." *Pottenger v. Potlatch Corp.*, 329 F3d 740, 746 (9th Cir 2003). In the Ninth Circuit, the following qualifications would need to be satisfied:

> (1) "[M]ake a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof" at trial;
> (2) Show that "there is an issue that may reasonably be resolved in favor of either party," and that the issue should therefore be resolved by the finder of fact; and
> (3) "[C]ome forward with more persuasive evidence than would otherwise be necessary when the factual context makes the nonmoving party's claim implausible."

*British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F2d 371, 374 (9th Cir 1989); *Leisek v. Brightwood Corp.*, 278 F3d 895, 898 (9th Cir 2002) ("If

---

[3] See fn. 2 regarding PACER.gov and OECI outages.

PLAINTIFF'S BRIEF IN OPPOSITION TO PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Page 11 of 18

the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." (quoting *Celotex Corp. v. Catrett*, 477 US 317, 323–324, 106 S Ct 2548, 91 L Ed2d 265 (1986))).

**B. *Monell* Standards**

To establish municipal liability, a plaintiff must demonstrate that: (1) they were deprived of a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy, custom, or practice amounted to deliberate indifference of the plaintiffs' constitutional rights; and (4) the policy, custom, or practice was the "moving force" behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citation omitted).

A plaintiff may establish that the policy, custom, or practice was the cause of injury in three ways: (1) "a city employee committed the alleged constitutional violation pursuant to [either] a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy"; or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (citations and internal quotations omitted).

**C. Claim 2: Pattern of Unlawful Arrests of Left-leaning Protesters**

<u>1. Fourth Amendment Right</u>

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend IV. "A 'seizure' triggering the Fourth Amendment's protections occurs only when

government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (omissions in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). This may occur through coercion, physical force, or a show of authority. *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997). On these facts, there is no dispute that Ms. Ahern was seized.

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Lacey v. Maricopa County*, 693 F.3d 896, 918 (9th Cir. 2012) (citation omitted). "Probable cause exists if the arresting officers had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a prudent person to believe that [the arrestee] had committed or was committing a crime." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097-98 (9th Cir. 2013) (alteration in original) (quoting *Maxwell v. County of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012)). "To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules. It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Probable cause is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotations and citations omitted).

The probable cause and specificity requirements thus are the essential features of the Fourth Amendment, because they provide the animating limitations on the intrusions of the

government. *Stanford v. Texas*, 379 U.S. 476, 485 (1965).[4] Indeed, as explained by the Court in *Stanford*, that requirement of specificity is essential to protect the First Amendment, because "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Id*. (quoting *Marcus v. Search Warrant*, 367 U.S. 717, 729 (1961)). Particularly when people are engaged in activity that is specifically protected by the First Amendment—assembling in groups in public places in order to express their opinions—the protections of the Fourth Amendment must be scrupulously honored in order to avoid the danger identified by the Court over 60 years ago. *Marcus*, 367 U.S. at 729.

    2. A Jury Could Conclude That the City Has An Unconstitutional Practice of Unlawful Arrests

Defendant City spends the bulk of its motion describing the plans it wrote down regarding the August 17, 2019, and related policies as described in their directives. Omitted is what one officer admits on the radio: that arrests were driven on a "stretch" of the Constitution. Ex. 002. A jury could conclude that this was in fact the plan and directive for the day. The other officer saying, "Are we being recorded?" followed by the end of the recording further highlights this. *Id.*

The arrests made on the bases of Disorderly Conduct II and Interference with a Police Officer were made within an hour or two of the airplane broadcasts. A jury could conclude that the call for arrests made on the airplane radio channel was further discussed, and approved, when the recording stopped. And, even if no further discussion occurred, the statement broadcast to all officers policing the protest that unlawful arrests should be made is enough.

---

[4] The "immediate evil" that motivated the adoption of the Fourth Amendment was the history of general warrants issued by the crown in the colonies. *Payton v. New York*, 445 U.S. 573, 583 (1980). In what was described as a catalyzing event leading to America's war for independence, James Otis described the evil at the heart of general warrants that "they placed 'the liberty of every man in the hands of every petty officer.'" *Stanford v. Texas*, 379 U.S. 476, 481 (1965).

PLAINTIFF'S BRIEF IN OPPOSITION TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

As described above, Defendant Kammerer's account of why he believed he had probable cause to arrest Ms. Ahern flies in the face of the easily ascertainable facts presented to Defendant Kammerer on August 17. Officers must have an objective, reasonable basis to formulate probable cause. *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018). A jury could easily conclude that he had none, and instead followed through with the stated plan announced over the radio.

As Exhibit 004 shows, multiple officers encountered Ms. Ahern prior to Defendant Kammerer directing Sgt. Cioeta to arrest her—including Sgt. Cioeta. *Id.* at 1:48 (Noting the approaching squad of bicycle officers). Sgt. Cioeta testified that he did not witness the acts that Defendant Kammerer wrote about in his report. Cieota Dep. 24:6-14. He did, however, direct his officers to arrest Ms. Ahern after being directed by Defendant Kammerer. *Id.* at 27:6-6; 33:13-34:8 (describing his testimony to an IPR investigator).

It is clear from these facts that a) Defendant Kammerer did not have sufficient probable cause to have Ms. Ahern detained, b) that Ms. Ahern's rights were violated in the process, c) Defendant Kammerer perpetrated this act because he knew that this was the plan all along to arrest people on bogus charges, and d) that he would not be disciplined for it. On the latter point, Defendant Kammerer was vindicated: he has not been held accountable for a clear violation of Ms. Ahern's rights. Nor has he been sufficiently disciplined for his other misconduct.

The four officers who arrested people on August 17, 2019 did so with a similar understanding. Officer Lino Pavon remained on the force following his highly suspicious incident where he slashed his own tires in an attempt to frame another person.[5] Officer Lehman is still on the force despite well-documented misconduct, including actually sustained uses of force.

---

[5] Maxine Bernstein, *Tire-slashing of Portland police patrol car leads to investigation of officer*, The Oregonian (Dec. 4, 2013), available at https://www.oregonlive.com/portland/2013/12/tire-slashing_of_portland_poli.html.

The officers involved in Ms. Mitsch's arrest remain Portland Police officers. The City has been deliberately indifferent to officer misconduct, and Ms. Ahern became another one of their victims. They must a face a jury on this Claim.

**D. Claim 5: Pattern of First Amendment Retaliation**

<u>1. First Amendment Right</u>

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U. S. 250, 256 (2006). In order to show a First Amendment violation, plaintiffs must provide evidence that that their "protected activity was a substantial motivating factor in . . . [D]efendant[s'] conduct," that is, "there was a nexus between [Defendants'] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). "As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence[.]" *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002).

<u>2. The Portland Police RRT Holds Deep Contempt for the Law and Protesters</u>

First, spitting is clear expressive that demonstrates disgust to any viewer. As Defendant Kammerer kept reiterating, Ms. Ahern's face appeared "angry," Kammerer Dep. 132:17-133:1, and Defendant Kammerer's face appears angry when she sees her spit. Ex. 001 at 0:04. Defendant Kammerer clearly did not need an explanation as to what Ms. Ahern's expressive conduct meant. A jury could easily conclude that there was a nexus between Defendant Kammerer's retaliatory act and Ms. Ahern's protected conduct.

Second, the Proud Boys also disrupted traffic, took over an entire bridge, and brought far more alarm to the public than the counter-protesters did, as evinced by the size of the counter-

protest to their presence. And yet, no Proud Boy was arrested on August 17. Despite the Proud Boys and their associates running amok in Portland, OR for years on end, *see* First Amended Complaint, Dkt. 37, ¶¶ 15-27, the Bureau still billed them as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 5— Incident Action Plan (Filed under seal). A jury could conclude that the Portland Police had picked a side.

Third, the Rapid Response Team ("RRT"), whom Defendant Kammerer was deployed with on the date of the incident, hold clear antipathy towards the civilian control of their operations. In 2021, RRT resigned *en masse* in clear protest over one of their members being indicted for criminally assaulting a protester.[6] Defendant Kammerer offered his personal testimony as to why he believed the RRT should disband. He first blamed the Mayor Wheeler for "suspended the use of tear gas."[7] Kammerer Dep. 102:3-4. Defendant Kammerer next blamed former-Commissioner Hardesty for a misstatement she made. *Id.* at 103:4-12. Last, Defendant Kammerer blamed the Multnomah County DA for not charging "most" crimes at protests. *Id.* at 105:8-22. On the latter point, DA Schmidt only limited prosecutions on cases involving the very crimes abused by officers like Defendant Kammerer, including Disorderly Conduct II and Interference with a Police Officer.[8] A jury could conclude that Defendant Kammerer, and the

---

[6] Maxine Bernstein, *Officers, sergeants resign en masse from Portland's Rapid Response Team crowd control unit*, The Oregonian (Jun. 17, 2021), available at https://www.oregonlive.com/crime/2021/06/officers-sergeants-with-portlands-rapid-response-team-resign-from-the-specialized-crowd-control-unit.html.

[7] Mayor Wheeler did not suspend the use of tear gas until September 10, 2020. Everton Bailey Jr., Portland Mayor Ted Wheeler orders police to immediately stop using type of tear gas on protest crowds, The Oregonian (Sept. 10, 2020), available at https://www.oregonlive.com/portland/2020/09/portland-mayor-orders-police-to-immediately-stop-using-tear-gas-on-protest-crowds.html. Earlier in the summer, Mayor Wheeler limited the use of tear gas to matters of "life-safety." *Don't Shoot Portland*, Dkt. 29 at 3 (Detailing the limitation placed ahead of the Court's temporary restraining order hearing on the use of tear gas.)

[8] MCDA, District Attorney Mike Schmidt announces policy regarding protest-related cases (August 11, 2020), available at https://www.mcda.us/index.php/news/district-attorney-mike-schmidt-announces-policy-regarding-protest-related-cases

PLAINTIFF'S BRIEF IN OPPOSITION TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Page 17 of 18

RRT, give no regard for civilian control when it feels like they might be actually held accountable, and the City acquiesces to it, condoning their custom and practice.

Last, as has been discussed in other litigation, the Portland Police held a 2018 RRT training where "a slide glorifying violence against left wing protestors" was shown. *Don't Shoot Portland*, 2022 WL 2700307, *5 (D. Or. 2022). Defendant Kammerer claims he had not seen this slide before. Kammerer Dep. 96:3-19. However, he did attend the training when it was shown. Ex. 12—Excerpt from Training History. This slide went unremarked upon by Police Bureau staff, including Commander Dobson, until it was produced in discovery in the *Don't Shoot* case. Ex. at 13 ("Only [Jeffrey McDaniel] and one other person, Commander Craig Dobson, recalled seeing the meme prior to this investigation.") This training occurred merely one year before Ms. Ahern's arrest. A jury could conclude that this training, and the silence surrounding it, demonstrates the City's custom and practice of attacking leftist protesters.

Defendant City must a face a jury on this Claim.

## CONCLUSION

Based on the foregoing, Defendant City's Motion for Partial Summary Judgment must be **DENIED**.

DATED: February 23, 2024.

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839
