UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

HANNAH AHERN,

                Plaintiff,

      v.

ERIK KAMMERER and CITY OF
PORTLAND,

                Defendants.

Case No. 3:21-cv-00561-YY

FINDINGS AND
RECOMMENDATIONS

YOU, Magistrate Judge.

**FINDINGS**

Plaintiff Hannah Ahern was arrested and charged with disorderly conduct in August of 2019 after spitting in the street toward a police riot truck at a protest in downtown Portland. The criminal charge was dropped, and plaintiff brought this lawsuit against Erik Kammerer, the Portland Police Bureau officer who initiated her arrest, and his employer, the City of Portland. Plaintiff asserts (1) a Fourth Amendment claim for unlawful seizure against Kammerer; (2) a Fourth Amendment *Monell* "pattern and practice" claim against the City; (3) a Fourteenth Amendment due process claim based on fabrication of evidence against Kammerer; (4) a First Amendment retaliation claim against Kammerer; (5) a First Amendment *Monell* "pattern and

practice" claim against the City; and (6) state tort claims for false arrest and battery against the City. First Am. Compl. ¶¶ 51–83, ECF 37.

Currently pending is the City's Motion for Partial Summary Judgment (ECF 59) on plaintiff's *Monell* claims, in which she alleges that the City had an unconstitutional pattern or practice of arresting left-leaning protestors without probable cause or because of their political message.[1] Because plaintiff has not produced evidence sufficient for either claim, the City is entitled to summary judgment on plaintiff's *Monell* claims.

## I.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324 (citing FED. R. CIV. P. 56(e)).

The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are

---

[1] Previously, the City moved to dismiss plaintiff's Fourth Amendment *Monell* claim on the basis that Kammerer had probable cause to arrest plaintiff for spitting on the street pursuant to O.R.S. 164.785(2), which criminalizes placing "any polluting substance" in a street or road. The court found that "spit" was not among the class of substances the legislature intended to include in that statute. *See* Findings and Recommendations, ECF 28, *adopted by* Order, ECF 35.

resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## II.    Legal Standard for *Monell* Claims

Local government entities "may not be held vicariously liable for the acts of its employees under the doctrine of *respondeat superior.*" *United States v. Cnty. of Maricopa, Arizona*, 889 F.3d 648, 652 (9th Cir. 2018); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). "Instead, a local governmental body may only be held liable under § 1983 'if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation.' " *Karthauser v. Columbia 9-1-1 Commc'ns Dist.*, 647 F. Supp. 3d 992, 1023 (D. Or. 2022) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). To succeed on such a claim, plaintiffs "must show that their injury was caused by a municipal policy or custom." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 883 (9th Cir. 2022) (quoting *Los Angeles County v. Humphries*, 562 U.S. 29, 30–31 (2010)).

Under *Monell*, a municipality may be liable for a constitutional violation under 42 U.S.C. § 1983 based on: "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019). A plaintiff also "may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992).

A "policy" is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008). A "custom" is a "widespread practice that, although not authorized by written law or express

municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 890 (9th Cir. 1990).[2] "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled . . . policy.'" *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.*

## III.    Claim 2: Fourth Amendment *Monell* Claim

Plaintiff's Fourth Amendment *Monell* claim alleges that Kammerer's unconstitutional arrest is "illustrative of a pattern and practice of PPB officers violating the Fourth Amendment rights individuals at protest demonstrations countering white supremacist groups and/or police misconduct." First Am. Compl. ¶ 58, ECF 37. Further, plaintiff asserts that the City failed to adequately train its officers regarding unlawful arrests, and does not have an adequate supervisory review or discipline system for officers who make arrests without sufficient legal justification. *Id.* ¶¶ 59–60.

Portions of plaintiff's Fourth Amendment *Monell* claim reference the City's allegedly inadequate "supervisory review of incidents where officers use force," or failure to discipline officers "when the force is clearly excessive[.]" *Id.* ¶ 59. However, plaintiff's complaint does not allege that Kammerer used excessive force during her arrest; in fact, Kammerer identified plaintiff for arrest and other officers made the actual arrest. *See id.* ¶¶ 42–43. The City's motion

---

[2] Courts and litigants have also referred to this as a "pattern or practice," which plaintiff does here. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 923 (9th Cir. 2001) (referring to "custom, pattern or practice").

asserts that because plaintiff "has not sued defendant Kammerer for excessive force," and has "tied her *Monell* claims explicitly to Kammerer's conduct," plaintiff "has no *Monell* claim for any Fourth Amendment violation related to excessive force." Mot. Summ. J. 9, ECF 59. Plaintiff's Opposition does not address this argument regarding excessive force, and at the hearing on the motion, plaintiff's counsel confirmed that the Fourth Amendment *Monell* claim solely focuses on unlawful arrest and not on excessive force. *See* Opp. 12–16, ECF 80.[3] Therefore, the analysis below focuses on evidence related to allegedly unlawful arrests.

### A.     Custom or Practice of Arresting Left-Leaning Protestors Without Justification

Plaintiff claims the City "had a pattern and practice of violating First and Fourth Amendment rights" in that it "had an open and verbalized policy of arresting leftist protesters without probable cause." Opp. 2, ECF 80. Plaintiff contends "[t]he City was so unabashed about this policy that they announced it over the radio before realizing they were recording and then quickly stopped recording." *Id.* In support, plaintiff has produced a video from a police plane that was patrolling overhead on the day of plaintiff's arrest. According to plaintiff, the following excerpts from the transcript and the close timing between this "radio broadcast" and the arrests of four individuals (including plaintiff) are sufficient to create a triable issue on the City's custom or practice of arresting left-leaning protestors without probable cause. *Id.* at 14–16.

Plaintiff proffers the following exchange that occurred at 1:17 p.m.:

> Speaker 8: Ops. Lincoln one to Ops, are you greenlighting arrests based on individual PC for discon?

---

[3] It should be noted, however, that plaintiff also asserts a state law battery claim. *See* First Am. Compl. ¶¶ 81–83, ECF 37. The analysis here does not address any part of that claim.

> Speaker 11: Absolutely. Let me know what resources you need.
> We'll get more there. Let's get people out of the street.[4]

Plaintiff also proffers the following exchange that occurred a few minutes later at 1:23 p.m.:

> Speaker 3 [Commander Robinson][5]: . . . I know it might be a
> stretch, but if we can arrest a couple people for discon. If we can.
>
> Speaker 4: Are we recording?
>
> Speaker 5: Yeah.
>
> Speaker 6: Alpha to Ops, we keep –
>
> Speaker 4: Huh?
>
> Speaker 5: Yeah.
>
> Speaker 6: -- bouncing back.[6]

The recording thereafter cut off and does not turn back on until approximately seven minutes later.[7] Plaintiff argues that the arrests of four individuals that followed "within an hour or two" of this broadcast were not supported by probable cause, and therefore, a jury could conclude that it "was the plan all along to arrest people on bogus charges" and the officers involved knew they "would not be disciplined" for making these arrests. Opp. 14–15, ECF 80.

Commander Robinson attests that his comment "it might be stretch" was not meant to communicate that officers were permitted to make illegal arrests without probable cause; rather, his "understanding of the [Crowd Management Incident Commander's] goals was that any arrest or citation would be based on probable cause that the person had committed a criminal offense."[8]

---

[4] Chavez Decl., Ex. 2, ECF 81 (video); *see also* Robinson Decl., Ex. 24 at 12:11–12:16, ECF 86-1 (transcript from "FLIR SYSTEMS RECORDED VIDEO FOOTAGE, PPB AIR2," Aug. 17, 2019).
[5] *See* Robinson Decl. ¶¶ 4–7, ECF 86.
[6] Chavez Decl., Ex. 2, ECF 81(video); Robinson Decl., Ex. 24 at 15:23–16:6, ECF 86-1 (transcript).
[7] *See id.*
[8] Robinson Decl. ¶ 7, ECF 86.

Commander Robinson describes that he was "monitoring the PPB radio traffic during the August 17, 2019 event" because it was his responsibility to "direct police resources for the event by speaking on the PPB radio."[9] Commander Robinson was "mindful of the availability of PPB resources to manage the August 17, 2019 protests," and in making the remark "it might be a stretch," he was referring to "the availability and adequacy of police resources to make arrests for the crime of Disorderly Conduct in the Second Degree."[10] He points to preceding radio communications that describe how protestors "were taking up the whole street" and show he was "asking the RRT Field Commander what police resources he needs, and directing RRT to get people out of the street."[11]

Indeed, the recording describes that 150 protestors had blocked traffic on the Burnside Bridge and lit smoke bombs, and "200 people on scooters [were] coming down Columbia from Third toward Second in traffic holding onto vehicles."[12] The crowd set up barricades on "Burnside blocking east and westbound traffic" and then proceeded down Martin Luther King Jr. Blvd. where it looked "like they [had] the whole street" and were "moving things across."[13] Officers were instructed to warn protestors to "obey all traffic laws or be subject to arrests," and two field arrest teams were dispatched.[14] Commander Robinson observed that people were "wielding weapons . . . at Ankeny and MLK," and stated, "[I]t looks like we've got some kind of assault going on."[15] Elsewhere, a woman called police to report that she had been pepper sprayed

---

[9] *Id.* ¶ 4.
[10] *Id.* ¶¶ 6, 7.
[11] *Id.* ¶ 6.
[12] Robinson Decl., Ex. 24 at 3–5, ECF 86-1.
[13] *Id.* at 7–8.
[14] *Id.* at 5.
[15] *Id.* at 8.

by a male with a baseball bat.[16] One officer expressed concern that "this group doesn't start

making a dash toward I-5."[17] Another officer remarked, "I'm guessing this group over at the east

side is gonna be the main point of focus for us," and "We'll be making arrests as we're able."[18]

During the radio communications, it was also noted that "[t]he . . . radios up here don't work,"

and that "[t]hey're awful" and the "[w]orst things ever," to which someone agreed, "[c]opy

that."[19] Right before the recording ended, an officer stated, "Apha to Ops, we keep . . . bouncing

back."[20] In this context, it can be concluded that Commander Robinson was not instructing

officers that they could make arrests without probable cause but, rather, was remarking on the

limited amount of police resources in the context of the hundreds of protestors who were

blocking traffic, lighting smoke bombs, and fighting in the street, all of which would provide

probable cause for disorderly conduct. *See* O.R.S. 166.025 (disorderly conduct statute

prohibiting fighting and obstructing vehicular traffic in public).

The parties also dispute whether plaintiff's arrest on August 17, 2019, was supported by

probable cause. *See* Opp. 3–5, 15, ECF 80; Reply 6, ECF 85. But even viewing plaintiff's arrest,

and Commander Robinson's remarks, in the light most favorable to plaintiff, she has failed to

produce sufficient evidence to defeat the City's motion for summary judgment on her *Monell*

claims. In particular, plaintiff has not produced admissible evidence of other similar incidents to

create a triable issue on whether the City had a custom or practice of "arresting leftist protestors

without probable cause." Opp. 2, ECF 80. Primarily, plaintiff relies on newspaper articles and

the existence of other lawsuits related to arrests that occurred on the same day that plaintiff was

---

[16] *Id.* at 6.
[17] *Id.* at 9.
[18] *Id.* at 11.
[19] *Id.* at 4.
[20] *Id.* at 16.

arrested to establish a "pattern or practice" of unlawful arrests. *See id.* at 5–7. At best, these

materials establish that other lawsuits or investigations into PPB officers exist; however, "the

mere fact that such lawsuits were filed does not support the existence of a policy, custom, or

practice of allowing excessive force by police officers." *Gillam v. City of Vallejo*, No. 2:14-cv-

02217-KJM-KJN, 2016 WL 4059184, at *7 (E.D. Cal. May 27, 2016), *report and

recommendation adopted,* No. 2:14-cv-02217-KJM-KJN, 2016 WL 4041508 (E.D. Cal. July 28,

2016); *see also Mood v. Cnty. of Orange*, No. 8:17-cv-00762-SVW-KK, 2019 WL 13036027, at

*7 (C.D. Cal. July 25, 2019), *aff'd sub nom. Mood v. Cnty. of Orange*, 830 F. App'x 923 (9th

Cir. 2020) (rejecting as inadmissible contents of newspaper article that *pro se* plaintiff seemed to

offer to avoid summary judgment on *Monell* claim for use of excessive force); *Strauss v. City of

Chicago*, 760 F.2d 765, 768–69 (7th Cir. 1985) (noting that for *Monell* claims: "[T]he number of

complaints filed, without more, indicates nothing. People may file a complaint for many reasons,

or for no reason at all. That they filed complaints does not indicate that the policies that [the

plaintiff] alleges exist do in fact exist and did contribute to his injury.").

There are additional problems with the evidence that plaintiff proffers regarding other

arrests on August 17, 2019. With respect to one individual, Hezekiah Bulnes, plaintiff could not

"locate any discovery about this arrest," but argues that from other "[c]ourt records, it appears

that Mr. Bulnes was arrested by the notorious protest officer, Craig Lehman." Opp. 6, ECF 80.

Plaintiff then refers to an attached internal investigation into Lehman that sustained an excessive

force finding, but the exhibit does not appear in the record. *See* Opp. 6, ECF 80.[21] In any event,

there is no evidence that the Bulnes arrest on August 17, 2019, was made without probable

---

[21] Plaintiff cites to Exhibit 9 of the Chavez Declaration, ECF 84 (filed under seal). The exhibits attached to the Chavez Declaration are not separately numbered, and the referenced "Exhibit 9" does not appear to be included as an attachment.

cause, and even assuming that there actually was a report sustaining an excessive force finding against Lehman at some point in the past, it does not tend to prove a pattern or practice of arresting left-leaning protestors without probable cause.

Plaintiff also identified the arrest of "Ms. Mitsch" on August 17, 2019, but the only evidence offered is the complaint filed in *Mitsch v. City of Portland*, Case No. 3:21-cv-01222-SB, and as discussed above, this does not establish a "pattern and practice" of arresting leftist protestors without justification. *See* Opp. 7, ECF 80.

Finally, plaintiff identified the arrest of Teagan Winkler on August 17, 2019. *See* Opp. 6, ECF 80. For this arrest, plaintiff provided a police report by Officer Lino Pavon describing the circumstances leading to Winkler's arrest.[22] The parties briefly engage in a dispute about whether Winkler's arrest was supported by probable cause. *See* Opp. 6, ECF 80; Reply 8, ECF 85. But even assuming without deciding that both plaintiff's and Winkler's arrests were not supported by probable cause, the City is correct that these "two arrests on a single afternoon during a protest lasting almost eight hours involving thousands of protestors do not create an unconstitutional *Monell* practice," Reply 8, ECF 85, even when combined with the "radio transcript" evidence mentioned above. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also Warren v. Yamhill Cnty.*, No. 3:23-cv-00911-SI, 2024 WL 36788, at *6 (D. Or. Jan. 3, 2024) ("A single incident generally does not support a claim of longstanding custom or practice.") (citing *Saved Mag. v. Spokane Police Dep't*, 19 F.4th 1193, 1201 (9th Cir. 2021) ("Plaintiffs' allegations amount to no more than an

---

[22] *See* Chavez Decl., Ex. 8 at 1–4, ECF 83 at 6.

isolated or sporadic incident that cannot form the basis of *Monell* liability for an improper custom."); *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) (stating that a "single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom")) (additional citations omitted).

 At the hearing on the City's motion for summary judgment, plaintiff's counsel offered to provide additional evidence at trial or to call witnesses for whom there is no deposition testimony in the record to support her *Monell* claims. But the time to produce that evidence has now passed; it was incumbent on plaintiff to produce evidence sufficient to create an issue of fact in response to the City's motion. *See Mendelson v. Country Coach, Inc.*, No. 5:06-cv-00572-SGL-OP, 2007 WL 4811927, at *2 (C.D. Cal. Nov. 19, 2007) (declining the plaintiff's request to provide additional evidence and analysis after a hearing on the defendants' motion for summary judgment: "It is incumbent upon parties facing a summary judgment motion to present their evidence in their opposition papers."); *see also Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) ("Summary judgment is not a dress rehearsal or practice run; it is the [critical] moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."). Plaintiff cannot rely on the speculative value of evidence or testimony not currently in the record to avoid summary judgment.

 For all of these reasons, the City is entitled to summary judgment on plaintiff's Fourth Amendment *Monell* claim to the extent it rests on an alleged custom or practice of arresting left-leaning protestors without probable cause.

//

//

//

11 – FINDINGS AND RECOMMENDATIONS

B.      **Failure to Supervise or Discipline Officers Who Make Unlawful Arrests**

Plaintiff asserts that Kammerer "defines a City system of unaccountability and

ratification of unconstitutional behavior." Opp. 7, ECF 80. In support of this theory, plaintiff

cites the following evidence:

- Kammerer has been subject to disciplinary investigation at least 10 times in the last 7 years; five times Kammerer was "exonerated" or the findings were "not sustained" and Kammerer had a "debriefing" as a result. *Id.*

- Kammerer does not remember anything in particular about these debriefings. *Id.* at 8.

- The investigation into plaintiff's arrest was "perfunctory"; no video evidence was reviewed and Kammerer "misstated facts about the case." *Id.* at 9.

- Other cases have found that PPB's "disciplinary and oversight system [was] unable to handle the pressure of the 2020 protests, and uncovered extreme bias and misinformation in PPB's training." *Id.* at 10 (quoting *Don't Shoot Portland v. City of Portland*, No. 3:20-cv-00917-HZ, 2022 WL 2700307, at *9 (D. Or. July 12, 2022)).

- Kammerer has faced other lawsuits for his conduct during the 2020 protests, including in *Opbroek v. City of Portland*, Case No. 3:22-cv-00610-JR*; Vontillius v. City of Portland*, Case No. 3:22-cv-00765 YY; and *Warren v. City of Portland*, MCCC Case No. 21CV21137. *Id.*

This evidence is not sufficient to avoid summary judgment on a failure to train or

supervise theory. The City produced undisputed evidence that it investigated Kammerer and took

corrective action against him in at least two specific cases, including plaintiff's. Reply 4, ECF 85

(citing Bell Decl. ¶ 14, ECF 66). The investigation into plaintiff's arrest was not "perfunctory."

The file is almost 1,200 pages long. *Id.* at 10; *see also* Manlove Supp. Decl. ¶ 1, ECF 88. The

City Auditor's Independent Police Review ("IPR") that investigates complaints of office

misconduct interviewed "all seven of the officers connected with Plaintiff's arrest, and IPR tried

repeatedly to interview Plaintiff, but she or her attorneys chose not to cooperate with her own investigation." Reply 10, ECF 85; *see also* Mot. Summ. J. 12, ECF 59.[23] Furthermore, the City has produced undisputed evidence showing that it has a system in place for investigating and tracking complaints of misconduct against officers, and that between 2016 and 2023, it has sustained findings against individual officers in 23 cases related to the use of force and 2 related to wrongful arrest.[24]

As discussed above, plaintiff has not provided any authority for the proposition that this case should be decided on the findings of fact, much less the bare allegations in a complaint, from a different case. The existence of other lawsuits with claims against Kammerer or against the City does not establish any relevant facts for this case. Again, because plaintiff has failed to produce sufficient evidence that the City repeatedly failed to supervise or investigate officers accused of making unlawful arrests, the City is entitled to summary judgment on plaintiff's *Monell* claim to that effect.

## IV.    Claim 5: First Amendment *Monell* Claim

Plaintiff's First Amendment *Monell* retaliation claim against the City alleges that Kammerer's conduct is "illustrative of a pattern and practice of PPB officers violating the First Amendment rights of individuals at protest demonstrations countering white supremacist groups and/or police misconduct." First Am. Compl. ¶ 75, ECF 37. Further, plaintiff asserts that the City uses "militarized force against left-wing or antifascist protestors" but does not use the same tactics against right-wing protestors. *Id.*[25]

---

[23] *See also* Lloyd Decl., Ex. 25 at 1, 6–10, ECF 89 (filed under seal).
[24] *See* Bell Decl. ¶¶ 2–10, 16–17, ECF 66; Estes Decl. ¶ 3, ECF 63; Vogan Decl. ¶¶ 3–4, ECF 67.
[25] Plaintiff's complaint also alleges that Kammerer was sufficiently senior such that his actions toward plaintiff "can fairly be said to be the official policy of the City of Portland." First Am.

First, the City argues that plaintiff did not actually suffer a First Amendment violation because she "did not intend to convey a particular message to third persons by spitting towards the police." Mot. Summ. J. 15, ECF 59 (citing, among others, *City of Dallas v. Stanglin*, 490 U.S. 19, 25 ("It is possible to find some kernel of expression in almost every activity a person undertakes . . . but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."). Plaintiff, of course, counters that she was exercising her First Amendment rights. Opp. 16, ECF 80.

But even assuming, without deciding, that plaintiff was exercising her First Amendment rights and that Kammerer unlawfully retaliated against plaintiff for doing so, plaintiff has not produced any evidence that the City has a pattern or practice of retaliating against left-wing protestors. Plaintiff cites the allegations in her complaint that "the Proud Boys also disrupted traffic, took over an entire bridge, and brought far more alarm to the public than the counter-protesters did, as evinced by the size of the counter-protest to their presence. And yet, no Proud Boy was arrested on August 17. Despite the Proud Boys and their associates running amok in Portland, OR for years on end[.]" Opp. 16–17, ECF 80 (citing First Am. Compl. ¶¶ 15-27, ECF 37). But "[a]llegations in a complaint are not evidence and therefore cannot create a dispute of fact at summary judgment." *Martinez-Barrera v. City of Gresham*, No. 3:20-cv-00015-SI, 2022 WL 623272, at *1 (D. Or. Mar. 3, 2022) (citing *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d

---

Compl ¶ 76, ECF 37. At the hearing on this motion, however, plaintiff's counsel conceded that Kammerer was not sufficiently senior to be a "final policy maker" with regard to plaintiff's *Monell* claims. *See McGuire v. Ciecko*, No. 3:08-cv-1098, 2010 WL 5631621, at *5 (D. Or. Nov. 10, 2010), *report and recommendation adopted sub nom. McGuire v. Clackamas Cnty. Couns.*, No. 3:08-cv-1098-AC, 2011 WL 198182 (D. Or. Jan. 19, 2011) (explaining that a municipality can be liable on a *Monell* claim if "an employee was acting as a final policymaker") (citing *Lytle v. Carl*, 328 F.3d 978, 982 (9th Cir. 2004)).

1107, 1112 (9th Cir. 2003) ("[Plaintiff] cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements.").

The passing reference to "right-leaning influencers" in the PPB's "Incident Action Plan" does not, as plaintiff suggests, demonstrate that the PPB had "picked a side." Opp. 17, ECF 80.[26] The Incident Action Plan describes the "likelihood of large crowds with opposing ideological perspectives to gather at the Waterfront Park" and that "[a] litany of commentary is encouraging or suggesting participation in physically violent disorder."[27] There is nothing in the report from which any reasonable inference that the PPB had "chosen a side" could be drawn.

Furthermore, plaintiff asserts that the Rapid Response Team to which Kammerer was deployed demonstrated "clear antipathy towards civilian control over their operations." Opp. 17, ECF 82. In support, plaintiff cites a newspaper article that describes how the Rapid Response Team "resigned en masse in clear protest over one of their members being indicted for criminally assaulting a protester." *Id.* But as explained above, the contents of a newspaper article are not admissible to prove the truth of the matters written about. *See Mood*, 2019 WL 13036027 at *7. The only other evidence plaintiff provides on this issue are portions of Kammerer's deposition where he stated that he did not agree with policy decisions of Mayor Ted Wheeler and District Attorney Mike Schmidt, and statements made by former City Commissioner JoAnne Hardesty. Opp. 17, ECF 80.[28] But none of this evidence supports the theory that the City had a policy of retaliating against left-leaning protestors.

---

[26] *See also* Chavez Decl., Ex. 5, ECF 84 at 4 (filed under seal) (exhibit not individually numbered).
[27] Chavez Decl., Ex. 5, ECF 84 at 4.
[28] *See also* Chavez Decl., Ex. 11 at 102:3–103:23, ECF 83.

Plaintiff also points to a 2018 Rapid Response Team training where a slide "glorifying violence against left wing protestors was shown." Opp. 18, ECF 80 (quoting *Don't Shoot Portland*, 2022 WL 2700307 at *5). The record shows that only two people, not including Kammerer, recall seeing the slide prior to the City's investigation into the incident; that investigation resulted in a recommendation that the officer who was responsible for the contents of the training materials be terminated.[29] But even viewing the slide in the light most favorable to plaintiff, the fact remains that plaintiff has not produced any evidence that the City has engaged in a pattern or practice of targeting left-wing protestors for arrests; the only arrest in the record that could arguably demonstrate that bias is plaintiff's own, and as explained above, a single isolated incident is insufficient to sustain a *Monell* claim against a municipality. *Warren*, 2024 WL 36788 at *6 ("A single incident generally does not support a claim of longstanding custom or practice.").

## RECOMMENDATIONS

Defendant City of Portland's Motion for Partial Summary Judgment [59] should be granted because plaintiff has failed to produce evidence sufficient to create a question of material fact regarding her *Monell* claims against the City.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due Tuesday, September 17, 2024.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

---

[29] *See* Chavez Decl., Ex. 13 at 1, 8, ECF 83.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

## NOTICE

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED September 3, 2024.


_____/s/ Youlee Yim You_____
Youlee Yim You
United States Magistrate Judge